IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NORRIS PAUL CAREY, JR., | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. GLR-18-162 |
| JOANNE THROWE, et al., | : | |
| Defendants. | : | |

## **MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendants Deputy Secretary Joanne Throwe ("Deputy Secretary Throwe"), Captain Edward Johnson ("Captain Johnson"), Captain Charles Vernon ("Captain Vernon"), and Superintendent Robert K. Ziegler's ("Superintendent Ziegler") Motion to Dismiss and/or for Summary Judgment (ECF No. 25) and Captain Edward Johnson's Motion to Dismiss Count III of the Complaint (ECF No. 13).[1] This 42 U.S.C. § 1983 (2018) action arises from Plaintiff Norris Paul Carey, Jr.'s termination from the Maryland Department of Natural Resources ("DNR") and the revocation of his Law Enforcement Officer Safety Act ("LEOSA"), 18 U.S.C. § 926C (2018), certification card. The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant the Motions.[2]

---

[1] Captain Johnson's Motion to Dismiss Count III of the Complaint was mistakenly docketed as a motion for summary judgment. Because the Motion is titled a "Motion to Dismiss" and Captain Johnson raises arguments under a motion to dismiss standard, the Court will construe it as a motion to dismiss.

[2] Also pending is Defendants' first Motion to Dismiss and/or for Summary Judgment, filed on April 13, 2018. (ECF No. 15). In response, on May 3, 2018, Carey filed

## I. BACKGROUND[3]

On December 31, 2013, Carey retired from the Maryland Natural Resources Police ("MNRP") after twenty-six years of service. (Am. Compl. ¶ 8, ECF No. 21). Three months prior to retiring from MNRP, Carey received a Notification of Complaint stating that Carey improperly communicated with another MNRP employee who was under investigation about the content of the investigation. (Id. ¶¶ 10–11). Captain Johnson, who was Captain of the Internal Affairs Unit at that time, oversaw the investigation. (Id. ¶ 13). Carey admitted to speaking with the employee in question, but denied disclosing any information about the investigation. (Id. ¶ 12). MNRP never brought any charges against Carey related to the Notice of Complaint, and Carey retired from MNRP in good standing. (Id. ¶¶ 19, 22).

On August 12, 2015, Carey began working for DNR. (Id. ¶ 23). On April 25, 2017, Carey received a LEOSA certification, which allowed him to carry a semi-automatic weapon. (Id. ¶ 69). On May 25, 2017, three months before Carey's contract expired, Deputy Secretary Throwe abruptly fired Carey. (Id. ¶¶ 29–32). She did not give Carey a reason for his termination, and prior to being terminated, Carey's supervisor had assured him that his contract would be renewed. (Id. ¶¶ 33–34).

---

an Amended Complaint. (ECF No. 21). When a plaintiff files an amended complaint, it generally moots any pending motions to dismiss because the amended complaint supersedes the original complaint. Venable v. Pritzker, No. GLR-13-1867, 2014 WL 2452705, at *5 (D.Md. May 30, 2014), aff'd, 610 F.App'x 341 (4th Cir. 2015). Accordingly, the Court will deny the Motion as moot.

[3] Unless otherwise noted, the Court takes the following facts from Carey's Amended Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted).

Carey alleges that he was fired from DNR in retaliation for two blog posts he submitted anonymously to the Salisbury News Blog (the "Blog") about Captain Johnson in December 2016 and January 2017. (Id. ¶¶ 44–59). The first blog post (the "December Post") displayed MNRP's Code of Conduct and Agency Values alongside photographs from Captain Johnson's personal Facebook page of women in "sexually provocative poses and the back of a man wearing a Pagan motorcycle jacket." (Id. ¶ 52). The second post (the "January Post") displayed photographs of Captain Johnson's assault weapon and his corresponding comments on Facebook, which made light of guns and gun violence. (Id. ¶ 59). One particular comment stated, "I don't think the game warden can catch us . . . LOL." (Id.).

On January 21, 2017, an anonymous commenter on Carey's January Post stated: "Since you seem to be protected on this site Paul Carey your deeds will be spread far and wide elsewhere including disparaging the very Department you're still employed by—for now . . . ." (Id. ¶ 60). On April 28, 2017, Captain Vernon called Carey and informed him that he had not retired from the MNRP in good standing and therefore had to return his LEOSA certification card. (Id. ¶ 70). Carey, confused by this assertion, checked his retirement status with an official of the Maryland Police and Correctional Training Commission who confirmed that he retired in good standing. (Id. ¶ 73). Carey therefore refused to return his LEOSA card, but stopped carrying a concealed firearm. (Id. ¶¶ 74, 81–82). Between May 9, 2017 and May 25, 2017—the date of Carey's termination from DNR—several MNRP officials repeatedly contacted Carey's supervisors at DNR to inform

them that Carey had not retired in good standing and that his LEOSA card was invalid. (Id. ¶ 80).

Around this time, Carey was also participating as a polygraph expert in an unrelated lawsuit regarding the winner of a fishing competition, the White Marlin Open (the "White Marlin Litigation"). (Id. ¶¶ 86–90). On May 8, 2017, Captain Johnson emailed Carey about the White Marlin Litigation in what Carey perceived to be a threatening manner. (Id. ¶ 92). Captain Johnson's email stated: "What is the date and time for the White Marlin Open trial in Baltimore Federal Court?" (Id. ¶ 91). An anonymous post also appeared on the Blog that stated, "[c]onsider the drama in court when they learn one of the polygraph examiners has a less than stellar background and lacks integrity." (Id. ¶ 93). On June 15, 2017, Captain Johnson wrote on the Facebook page for the White Marlin Open: "Too bad one of the polygraphers—Paul Carey, has the integrity of a lifer on death row." (Id. ¶ 101).

On January 18, 2018, Carey sued the MNRP, Deputy Secretary Throwe, Captain Johnson, and Captain Vernon. (ECF No. 1). On May 3, 2018, Carey filed an Amended Complaint that terminated MNRP as a Defendant and added MNRP Superintendent Ziegler as a Defendant. (ECF No. 21).

In his three-Count Amended Complaint, Carey alleges: First Amendment free speech retaliation under 42 U.S.C. § 1983 against Deputy Secretary Throwe, Captain Johnson, and Captain Vernon (Count I); violation of Carey's right to a LEOSA certification card under § 1983 against Superintendent Ziegler and Captain Vernon (Count II); and defamation per se against Captain Johnson (Count III). (Am. Compl. ¶¶ 105–32). Carey seeks declaratory and injunctive relief as well as monetary damages. (Id. at 17–20).

4

On April 13, 2018, Captain Johnson filed a Motion to Dismiss Count III of the Complaint. (ECF No. 13). Carey filed an Opposition on April 25, 2018. (ECF No. 17). To date, the Court has no record that Captain Johnson filed a Reply.

On July 2, 2018, Defendants filed a Motion to Dismiss and/or for Summary Judgment. (ECF No. 25). On August 7, 2018, Carey filed an Opposition. (ECF No. 29). On September 24, 2018, Defendants filed a Reply. (ECF No. 30).

## II. DISCUSSION

### A. Defendants' Motion to Dismiss and/or for Summary Judgment

#### 1. Conversion of Defendants' Motion

Defendants style their Motion as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d). See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). Pursuant to Rule 12(d), when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion. First, that the "parties be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment" and second, "that the parties first 'be afforded a reasonable opportunity for discovery.'" Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013) (quoting Gay v. Wall, 761 F.2d 175, 177 (4th Cir. 1985)).

5

When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). "[T]he party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). Rule 56(d) provides that the Court may deny or continue a motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." "[T]he failure to file an affidavit under Rule 56[(d)] is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." Nguyen v. CNA Corp., 44 F.3d 234, 242 (4th Cir. 1995) (quoting Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994)).

Here, Defendants caption their Motion in the alternative for summary judgment and attach supporting affidavits for the Court's consideration. In response, Carey filed a Rule 56(d) affidavit, requesting discovery. (Carey Aff., ECF No. 29-1). In light of Carey's affidavit and because the Court does not rely on the supporting affidavits in resolving the Motion, the Court will treat Defendants' Motion as a motion to dismiss.

**2.     Standard of Review**

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of

6

defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of America, N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd sub nom., Goss v. Bank of America, NA, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black

7

Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

### 3. Analysis

Defendants argue that Carey fails to state a claim for First Amendment retaliation, and that LEOSA does not create a federal right that is enforceable under § 1983. Defendants also contend that individual Defendants are entitled to qualified immunity and that Carey cannot state a claim under § 1983 against a state official in his official capacity. The Court agrees that Carey fails to state a claim for First Amendment retaliation and that LEOSA does not create a federal right that is enforceable under § 1983.

#### a. First Amendment Retaliation

Defendants contend that: Carey's December and January Posts were not speech on a matter of public concern; Carey fails to establish that his interest in his speech outweighs his employer's interest in an efficient workplace; Carey fails to demonstrate that he was deprived of a benefit; and Carey fails to establish a causal relationship between his speech and the deprivation of a benefit. Carey counters that: he engaged in speech on a matter of public concern; his interest in First Amendment expression outweighs his employer's countervailing interest; and a causal relationship exists between Carey's speech and his termination. The Court agrees with Defendants' first argument—Carey fails to establish that he spoke on a matter of public concern.

To bring a claim for retaliation under the First Amendment, a plaintiff must demonstrate: "(1) that he was a 'public employee . . . speaking as a citizen upon a matter of public concern [rather than] as an employee on a matter of personal interest'; (2) that his

'interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public'; and (3) that his 'speech was a substantial factor in the employer's termination decision.'" Grutzmacher v. Howard Cty., 851 F.3d 332, 342 (4th Cir. 2017) (quoting McVey v. Stacy, 157 F.3d 271, 277–78 (4th Cir. 1998)), cert. denied, 138 S.Ct. 171 (2017) (mem.).

"Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." Urofsky v. Gilmore, 216 F.3d 401, 406 (4th Cir. 2000) (en banc). "[M]atters of internal policy, including mere allegations of favoritism, employment rumors, and other complaints of interpersonal discord, are not treated as matters of public policy." Goldstein v. Chestnut Ridge Vol. Fire Co., 218 F.3d 337, 352 (4th Cir. 2000). The Court must "examine the content, context, and form of the speech at issue in light of the entire record" to determine if it rises to the level of speech on a matter of public concern. Urofsky, 216 F.3d at 406.

Here, neither of Carey's Blog posts rises to the level of speech on a matter of public concern. The December Post highlighted the photos of scantily clad women and the apparent reference to a motorcycle club that Captain Johnson had on his personal Facebook page. But the December Post's implication that Captain Johnson fell short of MNRP's internal Code of Conduct and Agency Values is a quintessential interpersonal dispute. There was no suggestion in the December Post that Captain Johnson was not fulfilling his duties, or that his actions were endangering the public welfare. Instead, the December Post reflected Carey's personal belief that Captain Johnson was not a model MNRP employee. See Brooks v. Arthur, 685 F.3d 367, 374–75 (4th Cir. 2012) (holding that a letter which

9

"was not expressed in terms of a breakdown in effective prison management, but rather focused on [the plaintiff's] personal displeasure with his supervisors" was not speech on a matter of private concern).

There is no indication that Captain Johnson's proximity to posing women or bikers implicated public safety or matters of social concern. Cf. Goldstein, 218 F.3d at 353 (holding that complaints about inadequate training for firefighters and flawed emergency procedures were matters of public concern); Edwards, 178 F.3d at 247 (holding that speech relating to proper use and handling of concealed weapons was a matter of public concern because it affected public safety). Carey did not insinuate that Captain Johnson's behavior was symptomatic of broader agency failings. Rather, it was a disagreement about the propriety of posting controversial photos on Facebook; this is a personal dispute that should not be constitutionalized.

The January Post, though closer to the line, also does not rise to the level of speech on a matter of public concern. Carey did not suggest that Captain Johnson failed to comply with agency protocol for gun safety or that he in any way endangered the public's safety. See id. Instead, Carey seemed to take issue with Captain Johnson's flippant discussion of gun violence and death. The tone Captain Johnson struck in discussing gun usage on a personal Facebook page may offend Carey, but this is a grievance of personal, not public, import. See Brooks, 685 F.3d at 375 ("whether someone's sense of fair play is offended is not the constitutional inquiry"). Carey did not clearly speak on a matter of public concern, and therefore he cannot state a claim for First Amendment retaliation.

Thus, the Court will grant Defendants' Motion as to Count I of the Amended Complaint. Accordingly, the Court will dismiss Count I.

      **b.**     **LEOSA Claim**

In Count II, Carey brings a LEOSA claim under § 1983. Defendants argue that the Court should dismiss Count II because LEOSA, codified at 18 U.S.C. § 926C (2018), does not give rise to a federal right enforceable under § 1983. Carey counters that LEOSA, which allows qualified retired law enforcement officers to carry a concealed firearm, gives rise to a federal right, the violation of which may be remedied by § 1983. The Court agrees with Defendants.

Section 1983 allows individuals to seek a remedy for the deprivation of federal constitutional and statutory rights by persons acting under color of state law. Maine v. Thiboutot, 448 U.S. 1, 4–5 (1980). Only "unambiguously conferred right[s]" can support a § 1983 cause of action. Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002). "[I]t is rights, not the broader or vaguer benefits or interests, that may be enforced under the authority of [§ 1983]." Id. Thus, to state a claim under § 1983, a plaintiff "must assert the violation of a federal right, not merely a violation of federal law." Tankersley v. Almand, 837 F.3d 390, 404 (4th Cir. 2016) (quoting Blessing v. Freestone, 520 U.S. 329, 340 (1997)).

Courts consider three factors when determining whether a statutory provision creates a federal right. Id. (quoting Blessing, 520 U.S. at 340). "First, Congress must have intended that the provision in question benefit the plaintiff." Id. (quoting Blessing, 520 U.S. at 340). "Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial

11

competence." Id. (internal quotation marks omitted) (quoting Blessing, 520 U.S. at 340–41). "Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." Id. (quoting Blessing, 520 U.S. at 341).

The Fourth Circuit has not addressed whether LEOSA creates a federal right that is enforceable through § 1983. The Court of Appeals for the District of Columbia is the only circuit court that has addressed the issue. See DuBerry v. District of Columbia, 824 F.3d 1046 (D.C. Cir. 2016). DuBerry held that § 926C creates a federal right enforceable under § 1983. Id. at 1054–55. But various district courts have disagreed. See Henrichs v. Illinois Law Enf't Training & Standards Bd., 306 F.Supp.3d 1049, 1057 (N.D.Ill. 2018) (holding that LEOSA does not create a federal right enforceable under § 1983); Burban v. City of Neptune Beach, No. 3:17-cv-262-J-34JBT, 2018 WL 1493177, *6 (M.D.Fla. Mar. 27, 2018) (same); Ramirez v. Port Auth., 2015 WL 9463185, at *5–6 (S.D.N.Y. Dec. 28, 2015) ("LEOSA does not create an individual right actionable under § 1983.").[4]

Applying the factors to LEOSA, the Court finds that it does not give rise to a federal right enforceable under § 1983. Section 926C states: "an individual who is a qualified retired law enforcement officer and who is carrying the identification required by subsection (d) may carry a concealed firearm . . . ." 18 U.S.C. § 926C (emphasis added).

---

[4] District courts that have considered whether LEOSA creates an private cause of action have also found in the negative. See Moore v. Trent, No. 09 C 1712, 2010 WL 52132727, at *3 (N.D.Ill. Dec. 16, 2010) ("[T]he court concludes that LEOSA does not reflect Congress's intent to create a federal private remedy."); Johnson v. New York State Dep't of Corr. Serv., 709 F.Supp.2d 178, 186 (N.D.N.Y. 2010) ("Congress did not intend to create a private cause of action under LEOSA.");

The first factor—whether Congress intended the provision to benefit the plaintiff—favors Carey. Both the text of § 926C, which is "phrased in terms of the persons benefitted," and the structure of § 926C(a), which preempts state law, demonstrate Congress's intent to confer an individual benefit. Gonzaga, 536 U.S. at 284. As to the second factor, § 926C's language is not so vague or amorphous as to defy judicial enforcement, again weighing in favor of Carey. LEOSA defines "qualified retired law enforcement officer," allowing for smooth judicial application and interpretation of § 926C. 18 U.S.C. § 926C(c).[5]

Section 926C does not, however, satisfy the third factor—imposition of an unambiguous obligation on the states. Section 926C does not, in fact, address the states at all. Instead, its text reads: "a qualified retired law enforcement officer . . . may carry a concealed weapon." § 926C(a) (emphasis added). "May" is permissive, indicating that "Congress did not unambiguously impose a binding obligation on the states, as U.S. Supreme Court precedent requires." Ramirez, 2015 WL 9463185, at *6 n.12.[6] See

---

[5] The Court is cognizant that judicial enforcement of LEOSA through § 1983 might "cause law enforcement to hesitate before enforcing gun control laws" because they are unsure about LEOSA's strictures. Ramirez, 2015 WL 9463185, at *6. The facts of this case demonstrate the confusion that could arise: the validity of Carey's LEOSA certification card was called into question, yet Carey refused to turn over his certification card. If LEOSA gave rise to a federal right enforceable through § 1983, law enforcement officials could be forced to sort through valid and invalid certification cards, hindering the enforcement of gun control laws. The Court's inquiry into the factors need not be "rigid or superficial," and these policy implications weigh against congressional intent to establish a cause of action that is enforceable under § 1983. Torraco v. Port Auth., 615 F.3d 129, 136 (2d Cir. 2010) (citing Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 322 (2d Cir. 2005)).

[6] By way of comparison, § 926A uses mandatory language: "shall be entitled to transport a firearm for any lawful purpose." 18 U.S.C. § 926A; Ramirez, 2015 WL 9463185, at *6 n.12. The use of shall and subsequently may within the same statute is telling. See id. (citing Lopez v. Davis, 531 U.S. 230, 241 (2001)) (noting that "shall" and

Tankersley, 837 F.3d at 407 (concluding that the Privacy Act "unambiguously imposes a binding and mandatory obligation on the states by using the phrase 'it <u>shall</u> be unlawful'" (emphasis added)); Hensley v. Koller, 722 F.3d 177, 182–83 (4th Cir. 2013) (finding the third factor fulfilled because 42 U.S.C. § 673(a)(3) requires states to enter into agreements with adoptive parents, specifies the contours of these agreements, and states that any adjustments to the agreements can only be made with the agreement of the adopting parents); Doe v. Kidd, 501 F.3d 348, 356 (4th Cir. 2007) ("[T]he provision uses mandatory rather than precatory terms: it states that plans 'must' provide assistance that '<u>shall</u>' be delivered with reasonable promptness." (emphasis added)); Pee Dee Health Care, P.A. v. Sanford, 509 F.3d 204, 212 (4th Cir. 2007) ("[T]he language unambiguously binds the states as indicated by the repeated use of '<u>shall</u>.'" (emphasis added)).

DuBerry held that § 926C's preemption of state law and the "nature of the ministerial inquiries into the historical facts in the officer's employment records and statutory powers of arrest, and into the objective firearms standard for active duty officers" imposed a sufficiently unambiguous obligation on the states. DuBerry, 824 F.3d at 1053. The Court cannot agree. Preemption carves out space for a federally created benefit, but it does not follow that the state is obligated to provide that benefit, or that an individual who is denied the benefit by the state has legal recourse to seek money damages. See Henrichs, 306 F.Supp.3d at 1056–57.

---

"may" have different implications, and the usage of one and then the other within the same statute indicates varied congressional intent).

What is more, by the DuBerry court's own reading of § 926C, the federal right created is the right to carry concealed firearms, not the right to the certification card to which § 926C(d) refers. DuBerry, 824 F.3d at 1055 ("[T]he firearms certification requirement does not define the right itself but is rather a precondition to the exercise of that right."). Section 926C, therefore, does not impose any obligation on the states to provide the certification card § 926C(d) requires. An individual's status as a qualified law enforcement official is also a precondition to the benefit § 926C establishes, rather than a part of the benefit itself. Nothing in the text of the statute suggests that a state's inquiry into whether an applicant is a qualified law enforcement official is mandatory. In short, § 926C speaks in precatory terms.

Thus, the Court concludes that LEOSA does not create a federal right enforceable under § 1983.[7] Accordingly, the Court will grant Defendants' Motion as to Count II.

**B.** **Captain Johnson's Motion to Dismiss Count III of the Complaint**

As a threshold matter, the Court addresses whether Captain Johnson's Motion to Dismiss Count III of the original Complaint applies to the Amended Complaint. An amended complaint "generally moots any pending motions to dismiss because the original complaint is superseded." Venable v. Pritzker, No. GLR-13-1867, 2014 WL 2452705, at

---

[7] The Court notes that a contrary holding, which would require states to grant LEOSA certifications or to provide the certification card detailed in § 926C(d)(1) and (2)(A), might implicate the Supreme Court's anti-commandeering jurisprudence. See Printz v. United States, 521 U.S. 898 (1997) (invalidating background check obligation imposed by Brady Act on state law enforcement personnel because it impermissibly "dragooned" them "into administering federal law").

*5 (D.Md. May 30, 2014) (citing Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 555 U.S. 438, 456 n.4 (2009)). But if the amended complaint does not resolve the deficiencies raised in the motion to dismiss the original complaint, the court may review the motion as addressing the amended complaint. See Buechler v. Your Wine & Spirit Shoppe, Inc., 846 F.Supp.2d 406, 415 (D.Md. 2012) (quoting 6 Charles Alan Wright et al., Federal Practice & Procedure § 1476 (3d ed. 2010)). In his Amended Complaint, Carey merely added Superintendent Ziegler as a Defendant and terminated MNRP as a Defendant. He did not amend his allegations against Captain Johnson in Count III. As a result, the Court applies the arguments in Captain Johnson's Motion to the Amended Complaint. The Court now turns to Captain Johnson's arguments for dismissal.

Among other arguments for dismissing Count III,[8] Captain Johnson contends the statement at issue—"Too bad one of the polygraphers—Paul Carey, has the integrity of a lifer on death row," (Am. Compl. ¶ 101)—is a nonactionable opinion. Carey counters that the statement is defamatory per se either because it impugns Carey's professional fitness or because it implies he is a criminal. The Court agrees with Captain Johnson that the statement at issue is nonactionable opinion.

To establish a prima facie case of defamation, a plaintiff must demonstrate that: "(1) the defendant made a defamatory statement to a third person, (2) the statement was false,

---

[8] Captain Johnson also argues that Carey fails to state a claim for defamation because Carey is a limited-purpose public figure and that Captain Johnson is entitled to qualified immunity. Because the Court agrees with Captain Johnson's argument that the statement at issue was a nonactionable opinion, it declines to address Captain Johnson's other arguments.

16

(3) the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." Offen v. Brenner, 935 A.2d 719, 723–24 (Md. 2007) (citing Smith v. Danielczyk, 928 A.2d 795, 805 (Md. 2007)). Under Maryland law, a statement is defamatory if it "tends to expose a person to public scorn, hatred, contempt[,] or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." Seley-Radtke v. Hosmane, 149 A.3d 573, 581 (Md. 2016) (alteration in original) (quoting Gohari v. Darvish, 767 A.2d 321, 327 (Md. 2001)).

Though opinions are generally not defamatory, "an opinion couched as a fact may be just as damaging as publishing an erroneous fact." Samuels, 763 A.2d at 243 (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 19 (1990)). Accordingly, an expression of opinion is actionable "if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Id. (citing Restatement (Second) of Torts § 566 (Am. Law Inst. 1977)).

Here, Captain Johnson's statement is a nonactionable opinion because it does not imply defamatory facts. In Milkovich, the Supreme Court held that the opinions at issue were actionable because a "reasonable factfinder could conclude that the statements . . . imply an assertion that . . . Milkovich perjured himself . . ." 497 U.S. at 21. The statement in question was: "[a]nyone who attended the meet . . . knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth." Id. at 5. The Milkovich Court emphasized that the "general tenor" of the statement added to its credibility because it was "not the sort of loose, figurative, or hyperbolic language which

17

would negate the impression that the writer was seriously maintaining that [Milkovich] committed the crime of perjury." Id. at 21.

Captain Johnson's appraisal of Carey's integrity, by contrast, does not give rise to the same conclusion. Captain Johnson's statement is "loose, figurative, [and] hyperbolic." Milkovich 497 U.S. at 21. A reasonable factfinder would not conclude that the statement implied any clear fact-based assertion, least of all the assertion that Carey was guilty of conduct demonstrating the integrity of a "lifer on death row," (Am. Compl. ¶ 101). Compare Samuels, 763 A.2d at 245 (holding that "[a]n assertion that appellant was terminated because of inferior performance on the job suggested that it was founded on fact and that appellant was incapable or unqualified to fulfill the obligations of a senior administrator at a community college."), with Greenbelt Coop. Publ'g Ass'n v. Bresler, 398 U.S. 6, 13–14 (1970) (concluding that a newspaper article stating an individual's negotiating position was "blackmail" was not actionable defamation because "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the individual's] negotiating position extremely unreasonable"), and Old Dominion Branch No. 496 v. Austin, 418 U.S. 264, 284–86 (1974) (concluding that statements calling a union "scab" a "traitor" were not actionable defamation because "traitor" was used "in a loose, figurative sense . . . [and it was] merely rhetorical hyperbole, a lusty . . . expression of . . . contempt").

What is more, unlike the connotation of perjury in Milkovich which was "susceptible of being proved true or false," 497 U.S. at 21, the Court questions how one could prove Captain Johnson's assertion that "Carey has the integrity of a lifer on death

row" either true or false. Captain Johnson's statement is a verbal flourish of disdain; its very tenor undercuts its viability as a basis for a defamation claim. This is especially true in light of its publication on Facebook, where exaggeration and hyperbole abound.

The Court, therefore, concludes that Carey fails to state a claim for defamation per se. Accordingly, the Court will grant Captain Johnson's Motion.

### III.  CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss and/or for Summary Judgment (ECF No. 25), construed as a motion to dismiss, and Captain Johnson's Motion to Dismiss Count III of the Complaint (ECF No. 13). The Court will deny as moot Defendants' Motion to Dismiss and/or for Summary Judgment (ECF No. 15) the original Complaint. A separate Order follows.

Entered this 31st day of January, 2019.

/s/
George L. Russell, III
United States District Judge